The PEOPLE of the State of Colorado, Plaintiff-Appellant,

v.

Frank Emilino BUENO, Defendant-Appellee,

and

George Joseph Archuletta, Defendant-Appellee.

Nos. 81SA537, 81SA538.

Supreme Court of Colorado, En Banc.

June 21, 1982.

Alexander M. Hunter, Dist. Atty., Peter Michael Maguire, Boulder, for plaintiff-appellant.

No appearance for defendants-appellees.

QUINN, Justice.

The People appeal from the district court's order dismissing the charge of ag-

gravated robbery, section 18–4–302(1), C.R.S.1973 (1978 Repl.Vol. 8),[1] against the defendants, Frank Emilino Bueno and George Joseph Archuletta. A confidential informant allegedly told a police officer that the defendants had participated in an armed robbery and the court ordered the People to disclose the name of the informant to the defendants or face dismissal of the actions. The People refused to disclose the informant's identity and the court dismissed the case with prejudice. We reverse the judgment and remand to the district court with directions to reinstate the case.

I.

On May 15, 1981, Detective Dave Allen of the Boulder Police Department filed affidavits in support of arrest warrants for the defendants.[2] The affidavits, which constitute the foundation for the order of disclosure here in issue, recited the following facts. On March 18, 1981, at approximately 9:00 p. m., an armed robbery occurred in the Denver Dry Goods Store in Boulder, Colorado. As the store was being closed an employee, Leslie Thompson, notified the manager, David Holbrook, that there were two men loitering in the vicinity of the general office. Shortly afterwards another employee, Kim Zeren, who worked in the jewelry department, approached the office with two briefcases containing jewelry from the display counters. Mr. Holbrook observed two males follow her into the office. When Ms. Zeren handed the cases to Leslie Thompson for storage in the store safe, one of the men produced a semi-automatic handgun and announced, "This is a hold-up." Mr. Holbrook described this man as a Spanish-American male, approximately 35 years of age, 5 feet 7 inches tall, wearing mirrored sunglasses and with a thick black mustache. The second man also produced a handgun. Ms. Zeren described this individual as a Spanish-American male, approximately 30 years old, 5 feet 6 inches tall, and with a black mustache. Two other employees, Christina Goodwin and Judith Verdon, entered the office during the robbery and all four employees were told to lie down on the floor. One of the robbers removed items from the safe, gave them to his accomplice, and then both men left the store. An inventory conducted after the robbery showed that $177,344 in jewelry and $6,272 in cash had been taken from the safe.

On March 19 Detective Allen arranged for the Denver Dry Goods employees to meet with a police department artist to compile composites of the two suspects. He also contacted several Denver area law enforcement agencies for assistance in investigating the crime. Among those contacted was Officer Daril Cinquanta of the Denver Police Department.

On May 13, 1981, Officer Cinquanta phoned Detective Allen and told him that he had met with a confidential informant who supplied him with information about the Boulder robbery. The affidavit of Detective Allen recited:

"Officer Cinquanta stated that he had just met with a Confidential Informant and that his informant had supplied Officer Cinquanta with information about some person who talked to the Confidential Informant of doing a robbery in Boulder in the middle of March 1981 and obtaining jewelry and cash. Officer Cinquanta told Affiant that the informant told Officer Cinquanta that the person stated that semi-automatic pistols were used and that the employees were made to lie down on the floor while this person and another person emptied the safe and carried jewelry out of the store in briefcases and that a third person drove the getaway car. Officer Cinquanta stated to the Affiant that the Confidential Informant stated to Officer Cinquanta that

1. The defendants also were charged with a crime of violence in that they used, possessed or threatened the use of a deadly weapon, a firearm, during the commission of the robbery. Section 16–11–309, C.R.S.1973 (1978 Repl.Vol. 8).

2. Separate affidavits were filed for arrest warrants for the defendants. Although the affidavits were identical in many particulars, they differ in their averments with respect to the events surrounding the photographic identifications of the defendants.

the persons involved in the above acts were known to the Confidential Informant or identified to the Confidential Informant as George Archuletta and Frank E. Bueno; and that Eddie Jiron had driven the getaway car. Officer Cinquanta told Affiant that the Confidential Informant told Officer Cinquanta that the person told the Confidential Informant that Archuletta and Bueno, and Jiron, had mustaches at the time of the robbery; but to change their appearances, Archuletta and Bueno shaved off their mustaches right after the robbery." The affidavit further recited that the informant had worked for Cinquanta for five years and had provided him with information leading to the arrest and convictions of persons for aggravated robbery, burglary and narcotics offenses.

On May 14, 1981, Detective Allen personally met with Officer Cinquanta who showed him mug-shots of Archuletta, Jiron and Bueno obtained from the records of the Denver Police Department. The photographs of Archuletta and Jiron were taken on May 3, 1981, after their arrest for aggravated robbery, and Archuletta's photograph did not depict him wearing a mustache. The photograph of Bueno was taken on April 23, 1981, when he was arrested for interference with a police officer, and showed him with a mustache. Officer Cinquanta told Detective Allen that the informant had identified the subjects in the photographs as the three persons involved in the Denver Dry Goods robbery.

Detective Allen on May 14, 1981, assembled a photographic lineup composed of photographs of the defendant Bueno and five other males similar in appearance. Leslie Thompson positively identified Bueno's photograph as that of the person who confronted her in the safe area of the office during the robbery. On May 21, 1981 Detective Allen obtained a police photograph of the defendant Archuletta taken by the Denver Police Department on May 13, 1981, showing Archuletta with approximately a week's growth of mustache and beard. Detective Allen showed this photograph to a Boulder Police Department artist, who filled in the mustache and blocked out other facial hair. The touched-up photograph was placed in a photographic lineup with five other males of similar appearance, and on May 28 David Holbrook made a photographic identification of Archuletta as one of the robbers.[3] The following day Kim Zeren viewed the same photographic lineup and also identified Archuletta as one of the robbers. On the basis of the above information arrest warrants were issued for the defendants Bueno and Archuletta.

The defendants were arrested and charged with the March 18, 1981, Boulder robbery. After pleading not guilty both defendants filed motions for the disclosure of the name and address of the informant alleged in the affidavits. They asserted that the informant, as a potential witness to the robbery, could provide testimony essential to a fair determination of the merits of the case. A hearing was held on the motion. The defendants presented no evidence in support of their respective motions. Instead, their attorneys argued that the informer related such specific information about the robbery that "he must be considered as having been there" and, as such, was a potential source of exculpatory evidence to the defendants, both of whom claimed they were misidentified as the perpetrators of the robbery.[4] Additionally, defense counsel argued that Officer Cin-

3. Although Holbrook said he could not be positive of his identification of Archuletta because the suspect had worn sunglasses during the robbery, he indicated that he was comfortable with his identification.

4. In support of the assertion that the defendant Bueno had been misidentified as one of the robbers, the attorney for Bueno argued to the court that "there are two Frank Buenos in the Denver area, my client, Frank E. Bueno; there's also a Frank S. Bueno who also has a record and, in fact, was recently convicted of an aggravated robbery." Also, Bueno's attorney argued that the informant's statement about the defendants having shaved off their mustaches after the robbery was inconsistent with the police photograph of Bueno on April 23, 1981, approximately five weeks after the robbery, which depicted him with a mustache.

quanta's statement to the affiant, Detective Allen, about an informer had been fabricated and, in this connection, advised the court that administrative action had been taken by the Denver Police Department against Cinquanta for allegedly falsifying an affidavit in another case.

After hearing argument the court ruled that the following factors justified an order of disclosure: the possibility of misidentification; the possibility of the informant being a witness to the robbery; and Officer Cinquanta's lack of credibility as a reliable source of information to Detective Allen. The court ordered the People to disclose the informant's identity to the defendants by 5:00 p. m. or, in the alternative, to suffer a dismissal of the charges. Officer Cinquanta declined to reveal the name of his informant and, when the court was so advised by the prosecution, it entered an order of dismissal with prejudice. The People thereafter filed this appeal pursuant to section 16–12–102, C.R.S.1973 (1978 Repl.Vol. 8).[5]

The People argue that the court's order of disclosure is not supported by the record and, even if disclosure was appropriate, the court should have considered a less drastic alternative to dismissal upon the prosecution's election not to disclose. Because we conclude that the defendants failed to establish an adequate basis in fact to support an order of disclosure, we need not address the question whether a remedy short of dismissal was a more appropriate sanction for nondisclosure.

## II.

The informer privilege is in reality the government's qualified privilege to withhold from disclosure the identity of persons who furnish information of crimes to law enforcement officers. *E.g., Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). The privilege recognizes the general obligation of citizens to communicate their knowledge of crimes to law enforcement officials and, at the same time, encourages that obligation by protect-

ing their anonymity under appropriate circumstances. The privilege, however, is not absolute and must be administered in consideration of other significant and competing interests. Thus, where the disclosure of an informer's identity, or of the contents of his communication, would be relevant and helpful to the defense of an accused, or would be essential to a fair determination of a cause, the privilege generally should yield. *Roviaro v. United States*, 353 U.S. at 60–61, 77 S.Ct. at 628, 1 L.Ed.2d at 645. We have employed an *ad hoc* balancing test in determining whether a court properly exercised its discretion ordering the disclosure of an informant's identity in a given case. *E.g., People v. Langford*, 191 Colo. 87, 550 P.2d 329 (1976); *People v. Arnold*, 186 Colo. 372, 527 P.2d 806 (1974). This test recognizes, on the one hand, the public interest in protecting the flow of information to the police about criminal activity and, on the other hand, the defendant's need for witnesses and evidence essential to a proper disposition of the case against him. "Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Roviaro v. United States*, 353 U.S. at 62, 77 S.Ct. at 629, 1 L.Ed.2d at 646.

Our cases generally have addressed two common situations involving the informer privilege. The first situation involving disclosure arises in connection with a defendant's motion to suppress evidence. If the disclosure of an informant's identity is essential to a fair determination of a suppression motion, then the trial court in its discretion may order disclosure. *E.g., DeLaCruz v. People*, 177 Colo. 46, 492 P.2d 627 (1972). Disclosure, however, is not automatic upon request. A defendant seeking disclosure must make an initial showing that the informant will provide information essential to the merits of his suppression

5. Although the prosecution filed separate notices of appeal with respect to each defendant, the separate appeals have been consolidated because of the identity of issues.

ruling. *E.g., People v. Dailey,* Colo., 639 P.2d 1068 (1982) (where defendant makes initial showing of good faith basis in fact to question accuracy of affidavit containing recitals of unnamed informant, court may order disclosure of informant's identity); *People v. Quintana,* 183 Colo. 81, 514 P.2d 1325 (1973) (where there is presented to the trial court evidence of lack of credibility of the affiant or his officer-informant, the court may in its discretion order disclosure). Thus, a defendant will meet this initial burden when he establishes a reasonable basis in fact to believe that an informer does not exist or, if he does, he did not relate to the police the information upon which the police purportedly relied as probable cause for an arrest or search. Disclosure in such cases not only safeguards the defendant's right to be free from an unlawful arrest or search but also protects the judicial process itself against abuse by false affidavit or testimony.

The second situation involving the disclosure of an informant's identity arises in connection with a defendant's claim that the informer is an essential witness on the issue of guilt or innocence. Here again, however, the right to disclosure is not automatic. As we stated in *People v. Marquez,* 190 Colo. 255, 259, 546 P.2d 482, 485 (1976):

"And while, as the Supreme Court noted in *Roviaro,* the desirability of calling a witness is a matter for the accused rather than for the government, the accused must at least make some minimal affirmative showing of this need for disclosure. *Parlapiano v. Dist. Ct.,* 177 Colo. 36, 492 P.2d 626. It would defeat the purpose of the balancing process to require such disclosure upon the defendant's unsupported assertion that he needs it."

**6.** We stated in *People v. Marquez,* 190 Colo. 255, 258–59, 546 P.2d 482, 485 (1976), that each case must be decided on its own facts and listed some of the factors relevant to the balancing process mandated by *Roviaro:*

"[W]hether the informant was an eyewitness and earwitness to the criminal transaction and whether the informer himself is available or could, in the exercise of reasonable diligence, be made available; whether other wit-

We believe the necessary foundation for the court's exercise of discretion in ordering disclosure should be a showing of a reasonable basis in fact to believe the informant is a likely source of relevant and helpful evidence to the accused. *See, e.g., People v. Langford, supra; People v. Marquez, supra.* Generally, a showing by the accused that the informant witnessed or participated in the crime will meet this threshold foundation and will provide an adequate basis for a discretionary order of disclosure. *See People v. Duran,* 188 Colo. 420, 535 P.2d 505 (1975); *Whaley v. People,* 171 Colo. 287, 466 P.2d 927 (1970).[6] In some cases a defendant will be able to make this showing from the averments of the affidavit filed in support of the arrest or search warrant, while in other cases independent evidence or a stipulation of fact will be necessary to establish the evidentiary predicate for a disclosure order. In every case, however, an order of disclosure must be supported by the record and may not rest upon speculation or conjecture. *People v. Langford, supra.*

### III.

Within the framework of these principles we turn to the facts of this case. The defendants' motion for disclosure was not based on a claim that the informant's identity was essential to a fair determination of a motion to suppress evidence. Instead, the motion for disclosure was predicated on the assertion that the informant was a potential source of exculpatory evidence on the issue of identification. Under these circumstances it was incumbent upon the defendants to demonstrate a reasonable factual basis to believe the informant was a witness to some part of the robbery and would be a source of relevant and helpful evidence to

nesses to the transaction are in a position to testify; the likelihood that the testimony of the informer will vary significantly from that of other available or potentially available witnesses; whether the defendant himself knows the identity of the informant or could without undue effort discover his identity; whether the informant was deeply or only peripherally involved in the criminal transaction."

the defense. Because in this case the defendants presented no evidence in support of their request for disclosure, the propriety of the disclosure order must stand or fall on whether the affidavits for the arrest warrants furnish a reasonable basis in fact for the order of disclosure. In making this determination the affidavits should be read in a commonsense and realistic manner. *See United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *People v. Ball*, Colo., 639 P.2d 1078 (1982).

█ Both affidavits state that the informant conveyed to Officer Cinquanta information which the informant in turn received from "some person who talked to the [informant about] doing the robbery in Boulder in the middle of March 1981 and obtaining jewelry and cash." The informant gave Cinquanta a detailed description of the robbery and, as stated in the affidavits, the informant's source of information mentioned that the defendants shaved off their mustaches shortly after the crime in order to change their appearances. In our view, when the affidavits are read in a commonsense and realistic manner, they strongly intimate that the informant obtained his information either from Bueno, Archuletta or Jiron, or from someone closely associated with one of them. The contents of the affidavits simply do not furnish a reasonable basis in fact to believe the informant witnessed the robbery, participated in its commission, or would be a source of relevant and helpful evidence to the defendants on the merits of the case.[7] In this respect the record here is markedly similar to the record in *People v. Langford, supra*, where we stated:

> "The record here discloses no evidence, direct or circumstantial, tending to support defendant's suggestion that the informant might have been an eye or ear-witness to any part of the incident, or a participant in the criminal transaction. All of the evidence indicated that the informant had merely relayed informa-

tion to officials, which proved accurate and resulted in defendant's arrest. When all the evidence discloses that the informant was an informant and nothing more, the prosecution should not, as a general rule, be required to reveal his identity." 191 Colo. at 90, 550 P.2d at 331.

What appeared to be a significant factor in the court's order of disclosure was its doubt concerning the truthfulness of Officer Cinquanta. In this regard the court alluded to counsel's investigation of "Officer Cinquanta's difficulties [in] the Denver metropolitan area and the lack of credibility that he has with judges of the State of Colorado, both federal and state." The nature of the defense counsel's investigation of Officer Cinquanta, however, was not established by testimony, stipulation or otherwise. Nor does the record furnish any facts upon which the court might have relied for its determination that the officer lacked credibility. Certainly, the argument of defense counsel cannot stand as the equivalent of evidence on this issue. Moreover, although the court's doubt concerning the veracity of a police officer's assertion about the existence of an informant might justify an order of disclosure in connection with a motion to suppress evidence, it does not support the proposition that the informant, whose very existence is open to question, is a witness likely to be helpful to the defense on the merits of the case. Thus, even assuming Officer Cinquanta might have falsified his statements to Detective Allen, that falsification, although implicating the validity of the defendants' arrests and the seizure of evidence, does not go to the issue whether there is a reasonable basis in fact to believe the informant was a witness to the robbery and could furnish helpful evidence on the issue of identification.

Because the undeveloped record fails to establish a reasonable basis to believe the

---

7. We also note that the affidavits state that the informant identified the police photographs of the defendants and Eddie Jiron, thus dispelling any uncertainty regarding the identity of the persons to whom the informant referred in his statement to Officer Cinquanta.

informant was a witness to the crime and would be a source of evidence helpful to the defense, the trial court abused its discretion in ordering disclosure under the circumstances present here. Upon remand the court in its discretion may entertain a further motion for disclosure to be resolved under the standards set forth in this opinion.[8]

The judgment is reversed and the cause is remanded to the district court with directions to reinstate the charges against the defendants.

---

8. In resolving any further request for disclosure the court retains the alternative of conducting an *in camera* hearing at which the prosecution would be required to present the informant for judicial interrogation. The guidelines for such hearing were set forth in *People v. Dailey*, Colo., 639 P.2d at 1077, n. 11 (1982):

"If such a hearing is ordered, the defendant should have an opportunity to submit questions he desires the judge to ask at that proceeding. A summary report of such proceedings should be made available to the defendant, and a transcript of the proceeding should be sealed and preserved for use in case of appellate review."